**Opinion issued October 5, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00278-CV**

———————————

**IN THE INTEREST OF A.A.C., A CHILD**

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2021-01162J**

## MEMORANDUM OPINION

After a bench trial, the trial court terminated the parent-child relationship

between A.R.C. (Mother) and A.A.C. (Alan).[1] Mother appeals the termination order,

raising three issues: (1) the evidence is insufficient to support a finding of

constructive abandonment; (2) the evidence is insufficient to support a finding that

---

[1]     We use a pseudonym to refer to the child involved here. *See* TEX. FAM. CODE
        § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

termination is in Alan's best interest; and (3) the trial court erred by appointing the Department of Family and Protective Services as Alan's sole managing conservator. Because the evidence supports the trial court's termination order, we affirm.

## Background

Alan was born in 2020 and came to the Department's attention when a report was made in 2021 alleging neglectful supervision by Mother. In 2021, the Department petitioned to be named temporary managing conservator of Alan and his two older siblings, V.H. (Valerie) and S.B. (Sarah), on an emergency basis and to terminate Mother's parental rights.[2] *See* TEX. FAM. CODE §§ 105.001(a), 262.101. The trial court granted the Department's emergency request and later held a full adversary hearing. *Id.* § 262.201. After the adversary hearing, the trial court appointed the Department as the children's temporary managing conservator pending a final hearing in the suit.

Mother's family service plan listed family reunification as the primary permanency goal for each child. The plan noted reports that Mother was "unstable" and had moved "from state to state." It also noted that Valerie and Sarah reported that, while under Mother's care, they were evicted from homes and had their utilities

---

[2]     We use a pseudonym to refer to the children. *See* TEX. R. APP. P. 9.8(b)(2). Mother has five children. Three of the children (Valerie, Sarah, and Alan) were under Mother's care prior to the Department's care. Her two other children, T.C. (Tina) and T.C. (Tyler), reside with their father in Houston. *Id.*

2

shut off. They also reported that Mother physically, mentally, and emotionally abused them. The plan also stated that Mother was using marijuana while driving with the children, and that she was admitted to a psychiatric hospital because of "concerns over her mental health and her being a threat to herself and others." The plan required Mother to provide stable housing for the children and maintain that housing for at least six months; participate in all meetings and court hearings; maintain monthly contact with the Department; obtain and maintain employment for at least six months; complete family therapy, as well as substance abuse, psychiatric, and psychological assessments, and follow all recommendations from these assessments.

Before trial, the Department filed a permanency report documenting Mother's progress on her family service plan. It stated that Mother had obtained housing from May 2022 to April 2023, was employed, had maintained contact with the Department, and participated in family therapy. Mother also completed a substance abuse assessment in December 2021, a psychiatric evaluation in December 2022, and a psychological evaluation in February 2022, which diagnosed her with bipolar disorder. She completed substance abuse counseling in December 2022 and individual counseling in June 2022. Lastly, drug testing showed that she tested positive for cocaine in November 2022.

3

The permanency report also detailed the Department's concerns about Alan's older siblings, including child neglect and suspected physical abuse. In December 2021, Valerie (17) and Sarah (15) participated in mental health assessments. Both admitted experiencing suicidal thoughts and self-harm. And both were diagnosed with adjustment disorder, mixed anxiety, depressed mood, and unspecified trauma. The assessment recommended therapy for both children and that their communication with biological family members "be strictly supervised and monitored to decrease the chances of [them] being privy to information that may heighten [their] level of anxiety and distress."

## A. Trial

Trial began in January 2023 with brief testimony from J. Coto, the Department's caseworker. Coto recounted that Alan was two years old and living in a foster home in Houston, Texas, and his sister, Sarah, was residing in a 24-hour residential childcare facility.[3] The trial court then recessed until March 2023.

In March, Mother informed the trial court that she agreed with naming Sarah's paternal grandmother as Sarah's sole managing conservator, but she did not want her parental rights terminated as to Alan. Instead, Mother wanted him also placed with Sarah's paternal grandmother, a non-blood relative to Alan, or for the

---

[3] Before trial began, Valerie turned 18.

Department to be named Alan's permanent managing conservator without terminating her parental rights.

Per Coto, Alan remained in the same foster home where he had been living since the suit began, and that Sarah was now living with her paternal grandmother. He testified that Alan had been in his foster home for most of his life, and his foster parents were meeting his physical and emotional needs and would adopt him if parental rights were terminated.

Coto next discussed that the three children came to the Department's attention most recently because of allegations that Mother smoked marijuana while driving them from Louisiana to Houston and posted on social media that she needed to save her family and that they were all going to heaven. Mother then had a "mental health episode" and was placed in a psychiatric hospital where she stayed for a month. When asked about the Department's concerns about Mother, Coto agreed that the primary concerns were her drug use and mental health issues.

Coto also discussed Mother's drug testing. Mother lived in Louisiana and only participated in drug testing when she came to visit Alan, because the Department would only pay for drug testing done in Texas. She was tested eight times and was found to have failed twice, once due to medication prescribed by her doctor and once due to illegal narcotics. Coto explained that he had continuing concerns over

Mother's drug use and that part of her therapy required her to maintain three months of negative drug tests.

Next, Coto recalled Mother's history with the Department stemming from cases in 2012 and 2013, which involved concerns about Mother's mental health and child neglect. Mother also had two neglectful-supervision cases in 2015 over concerns about her drug use and mental health. But only two of the cases, one in 2013 and one in 2015, were ruled as "reason to believe" by the Department.

Addressing Mother's family service plan, Coto conceded that Mother completed the psychiatric, psychological, and substance abuse assessments, as well as individual, family, and substance abuse therapy. And that she was receiving medication management through a Louisiana service provider. He had also visited Mother's home in Louisiana and said it was appropriate.

As to visitation, Coto testified that while Mother had the chance to visit Alan twice a month since August 2021, she only visited Alan eight times. Mother did not visit Alan during the first seven months of the case. She then visited him in March, April, May, July, September, October, and November 2022. Under cross-examination, Coto explained that the Department did not offer to transport Alan to visit Mother in Louisiana. Because of Alan's age, Coto did not think it was good for Alan to be transported to Louisiana for visits. The Department and the foster

parents discussed the possibility of transporting Alan to visits with Mother but decided that travelling "wouldn't be best for [Alan]."

According to Coto, Mother was not in regular contact with the Department. He questioned returning Alan to Mother because Alan had been in his foster parents' care since the suit began and was attached to them. It was also Coto's understanding that Mother was not asking for Alan to be placed in her care, but to live with Sarah's paternal grandmother who was 65 years old, already had custody of Sarah, and worked during the day. Alan was receiving speech therapy twice a month, and had doctor visits about once a month, so Coto did not "see how that would work." Additionally, the grandmother herself had expressed the same concern to the Department.

Mother testified next. She said she had five children, including: Valerie, who lived with her; Sarah, who lived with Sarah's paternal grandmother; Alan, who lived in a foster home; and two children, Tina and Tyler, who lived with their father in Houston. As to why this case began, Mother said her mother had asked her to come to Texas and upon arriving, her sister called the police who then sent Mother to a mental hospital. Mother recounted that the police talked to her and her sister, who said Mother was not taking her medication, which is when the police took Mother to the hospital. While describing the incident as a "set up," Mother denied suffering

from any mental health issues that day. She accused her mother of reporting her to the Department so that her mother could get the children's social security checks.

While hospitalized, Mother was diagnosed with bipolar disorder. She explained that she had previously been diagnosed with bipolar disorder, about five years before, and was prescribed medication. But she only took the medication randomly, and she stopped taking the medication when she moved to Louisiana in 2016. At the time of the incident, she explained that she was not taking any medication because she was busy working and never went to the doctor. After being discharged from the hospital, she restarted her medication.

When asked about visiting her children, Mother admitted she visited Tina and Tyler in Houston once a month. As to Alan, she explained that she was not aware she was allowed to visit him during the first seven months of the case. Mother stated she began visiting Alan after learning she could. While acknowledging that she missed some visits, she explained that was because she was busy with work in Louisiana.

The next witness to testify was R. Reddick, a Child Advocate Volunteer assigned to the case in September 2021. When asked about first meeting Alan, Reddick recalled how Alan required medical attention for ear infections. Reddick next discussed Alan's relationship with his foster family. She described Alan as very attached to his foster parents. He was the only child in their home, and they wished

to adopt him if parental rights were terminated. Reddick then described how visits between Alan and Mother were pleasant. And that during the first visit, while it took Alan some time to warm up to Mother, he eventually did. During later visits, Reddick described lots of interaction between Mother and Alan and that Mother was always happy to see him. Still, it was Reddick's recommendation that Alan be adopted by his foster parents.

The final witness was Alan's foster mother. Alan was placed in her home in late November 2021. She was told that Alan should have been talking when he first arrived, and his pediatrician recommended that he be taken to an audiologist, a speech therapist, and an otolaryngologist (ENT). Upon taking Alan to those appointments, she learned Alan had mild hearing loss in one ear that caused his speech delays. Alan began seeing a speech therapist who visited the home twice a week. At the time of trial, Alan was starting to speak in two to three sentences and was verbalizing his needs and wants but was not yet developmentally on target with his speech. He was also seeing an allergist and taking medication to address his allergies to dairy, shellfish, and eggs. Foster Mother also described how because Alan was chronically congested, his nose had to be suctioned and he needed a humidifier in his room. She took Alan to see his pediatrician, ENT, and allergist several times. She estimated that Alan went to see a doctor on average three times a month.

9

Foster Mother testified that if given the opportunity, she would adopt Alan. She knew that Alan has older siblings, and she wanted to encourage those relationships. She described taking him on a weekend visit to see his siblings. She also testified that she wanted to build up to a relationship between Alan and Mother and wanted Alan to know all his biological family.

Ultimately, the trial court found that Mother constructively abandoned Alan under section 161.001(b)(1)(N) of the Texas Family Code and that termination of her parental rights was in Alan's best interest. It also found also that the Department had rebutted the presumption that any parent should be named as Alan's managing conservator and appointed the Department as the sole managing conservator.

## Sufficiency of the Evidence

In her first issue, Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's constructive-abandonment finding. In her second issue, Mother challenges the legal and factual sufficiency of the trial court's best-interest finding.

## A.     Standard of Review and Law

To terminate the parent-child relationship under Texas Family Code section 161.001, the Department must establish by clear and convincing evidence that the parent engaged in one or more of the listed grounds for termination and that termination is in the child's best interests. *See* TEX. FAM. CODE § 161.001(b); *In re*

*N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re of J.F.-G.*, 627 S.W.3d 304, 311 (Tex. 2021); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *See In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018).

To be legally or factually sufficient under the clear and convincing standard, the evidence must be such that a factfinder reasonably could form a firm belief or conviction that its finding was true. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Under this standard, the distinction between legal and factual sufficiency review "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d at 630. In a legal sufficiency review, we look at the evidence in the light most favorable to the trial court's finding, and assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.L.*, 163 S.W.3d at 85. We disregard any evidence that a reasonable factfinder could have disbelieved, but we do not disregard undisputed facts that do not support the finding. *Id.*

In a factual sufficiency review, we give due consideration to the evidence that the factfinder reasonably could have found to be clear and convincing, considering all the evidence, including evidence in support of and contrary to the trial court's

11

findings. *In re J.F.C.*, 96 S.W.3d at 266. We analyze whether a reasonable factfinder could not resolve the disputed evidence in favor of its finding. *Id.* But we must be careful not to usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). The factfinder is the sole arbiter of witness credibility. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates the demeanor and credibility of witnesses. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). Because the trial judge saw the witnesses firsthand, we must give him or her due deference, despite the heightened factual-sufficiency standard. *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266. In reviewing all the evidence, we also keep in mind that the Department has the burden of proof in this termination proceeding. *See id.* at 264.

## B.    Constructive Abandonment

Mother contends that the Department failed to establish that she did not regularly visit or maintain significant contact with Alan. *See* TEX. FAM. CODE

§ 161.001(b)(1)(N). To prove constructive abandonment, the Department must establish four elements:

(1) the child has been in the permanent or temporary managing conservatorship of the Department for at least six months,

(2) the Department has made reasonable efforts to return the child to the parent,

(3) the parent has not regularly visited or maintained contact with the child, and

(4) the parent has shown an inability to provide the child with a safe environment.

*See* TEX. FAM. CODE § 161.001(b)(1)(N). Because Mother only disputes the third element, we limit our discussion to that issue. *See* TEX. R. APP. P. 47.1.

The disputed element focuses on the parent's conduct, not the Department's. *See In re A.K.L.*, No. 01-16-00489-CV, 2016 WL 7164065, at *6 (Tex. App.— Houston [1st Dist.] Dec. 8, 2016, pet. denied) (mem. op.). Alan was born in December 2020 and was removed from Mother's care in July 2021. Alan was placed with Foster Mother in Houston four months after removal and stayed there through the completion of trial in March 2023. Mother was allowed to visit Alan twice per month.

After Alan's removal, Mother did not visit him for seven months, until March 2022. The first month she did not visit was when she was in a psychiatric hospital. But the only explanation Mother offered for the next six months is that she did not

13

know she was allowed to visit him. During that same period Mother was in contact with the Department by phone and Zoom, but she did not ask about visiting Alan. Mother emphasizes that she made eight visits with Alan during the 20 months he was in the Department's care. She visited in March, April, May, July, September, October, and finally in November 2022. Mother explained that her failure to visit Alan in December 2022 and January 2023 was due to being busy at work, but she did not explain why she did not visit in June or August 2022 or in February 2023.

At trial, Mother asked that her rights not be terminated as to Alan but not that he be returned to her. Instead, she asked that he be placed with Sarah's grandmother, a non-blood relative of Alan's, or for the Department to be named as permanent managing conservator. Coto testified that Mother had the opportunity to visit Alan twice a month since the case began. Mother also admitted that she made monthly visits to see two of her children, Tina and Tyler, who also live in Houston.

In light of Coto's testimony, the trial court could have disbelieved that Mother did not know she could visit Alan during the first seven months. *See In re R.J.*, 579 S.W.3d at 117; *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (we cannot substitute our own judgment for that of the factfinder). We have also previously held that "[a] parent fails to regularly visit or maintain significant contact with their children when the parent fails to take advantage of visitation rights or when visits are intermittent or sporadic." *In re S.M.M.*, No. 01-22-00482-CV, 2022

14

WL 17981669, at *9 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (citing *In re S.S.*, No. 11-05-00083-CV, 2006 WL 1285125, at *3 (Tex. App.—Eastland May 11, 2006, no pet.) (mem. op.)).

The record reflects more than just the number of visits by Mother. It also shows: (1) long periods without contact between Mother and Alan after his removal and leading up to trial; (2) Mother never asked about visiting Alan during the first seven months he was in the Department's care; (3) Mother did not attempt to maintain contact with Alan by phone or video during the times she did not physically visit him; (4) she had monthly visits with her other children in the same city as Alan; and (5) there are three months where Mother did not explain why she did not visit Alan. *See M.C. v. Tex. Dep't of Fam. and Protective Servs.*, 300 S.W.3d 305, 310 (Tex. App.—El Paso 2009, pet. denied) (mother did not regularly visit or maintain significant contact with child when she visited only six to eight times in 12 months); *In re J.J.O.*, 131 S.W.3d 618, 628–29 (Tex. App.—Fort Worth 2004, no pet.) (evidence was legally and factually sufficient to support finding that mother had not regularly visited or maintained significant contact with child because mother made only 12 visits during nine-month period); *In re R.M.*, No. 14-02-00221-CV, 2003 WL 253291, at * 5 (Tex. App.—Houston [14th Dist.] Feb. 6, 2003, no pet.) (mem. op.) (parent did not regularly visit or maintain significant contact with child by visiting six to ten times over 14 months); *In re H.R.*, 87 S.W.3d 691, 699

15

(Tex. App.—San Antonio 2002, no pet.) (evidence was legally and factually sufficient to support constructive abandonment where parent only made intermittent visits to child over 10-month period); *see also In re T.G.*, No. 14-09-00299-CV, 2010 WL 1379977, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2010, no pet.) (mem. op.) (finding sufficient evidence of constructive abandonment where Mother visited "only occasionally" over eight-month period and did not visit for the seven months afterward); *C. G. v. Tex. Dep't of Fam. and Protective Servs.*, No. 03-18-00852-CV, 2019 WL 3367524, at *7 (Tex. App.—Austin July 26, 2019, no pet.) (mem. op.) (parent failed to maintain significant contact with two children when he attended only eight of 23 visits, ignored child during some visits, provided no financial or emotional support, and failed to call or send birthday cards); *White v. Tex. Dep't of Fam. & Protective Servs.*, No. 01-04-00221-CV, 2005 WL 174546, at *6 (Tex. App.—Houston [1st Dist.] Jan. 27, 2005, no pet.) (mem. op.) (visiting children six times over 10-month period, and leaving visitations early twice, was enough for factfinder to form belief appellants did not regularly visit or maintain contact with children).

That Mother explained why she did not visit or contact Alan for several of those months is not enough under either legal or factual sufficiency review. The trial court could have disbelieved her reasons and credited the Department's testimony and her monthly visits with her other children in the same city. *See In re J.L.*, 163

S.W.3d at 85 (reviewing court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible in a legal sufficiency review); *In re A.B.*, 437 S.W.3d at 503 (reviewing court must still provide due deference to decisions of factfinder, who had full opportunity to observe witness testimony first-hand and was sole arbiter of assessing witness credibility and demeanor).

We are mindful that the natural rights between a parent and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). But "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002); *see also In re E.C.R.*, 402 S.W.3d 239, 240 (Tex. 2013).

Viewing the evidence in the light most favorable to the trial court's finding, the factfinder could have formed a firm belief or conviction that Mother had not regularly visited or maintained contact with Alan. *See In re J.L.*, 163 S.W.3d at 85 (discussing legal sufficiency). The evidence is also factually sufficient because a reasonable factfinder could have resolved the disputed evidence in favor of the finding and formed a firm belief or conviction that Mother had not regularly visited or maintained contact with Alan. *See In re J.F.C.*, 96 S.W.3d at 266 (discussing

factual sufficiency); *In re H.R.M.*, 209 S.W.3d at 108 (same). We overrule Mother's first issue.

## C. Best Interest of the Child

Mother contends that termination was not in Alan's best interest because the trial court should have ordered a managing conservatorship that allowed her to remain in Alan's life.

"[T]he prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a). There is a strong presumption that the best interest of the child is served by maintaining custody with the child's natural parents. *In re K.C.M.*, 4 S.W.3d 392, 399 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). In determining the best interest of the child, courts examine several factors, including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individual seeking custody; (5) the programs available to assist the individual to promote the child's best interest; (6) the plans for the child by these individuals; (6) the stability of the home; (7) the acts or omissions of the parent indicating that the existing parent-child relationship is not a proper one; and (8) any excuse for parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors, often referred to as the *Holley* factors, are not exhaustive; some listed

may not apply, while other factors not included on the list may also be appropriate. *In re C.H.*, 89 S.W.3d at 27. The Department need not prove every factor as a condition precedent to parental termination, and the lack of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the child's best interest. *See id.* Sometimes, evidence of even one *Holley* factor may be sufficient. *Jordan v. Dossey*, 325 S.W.3d 700, 729 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

The best-interest analysis may include circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence. *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.). "A trier of fact may measure a parent's future conduct by [the parent's] past conduct and determine whether termination of parental rights is in the child's best interest." *Id.*; *see In re C.H.*, 89 S.W.3d at 28 (past performance as parent "could certainly have a bearing on [parent's] fitness to provide for" child).

Mother does not dispute that the *Holley* factors favor termination. We agree. At the time of trial, Alan was two years old and too young to testify about his own desires. *See Holley*, 544 S.W.2d at 371–72 (factor one). But the evidence shows that Alan is strongly bonded with his foster family with whom he has lived for most of his life. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the factfinder may

consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent.").

There is evidence of Mother's instability in several reports the Department received about her children. Two reports filed with the Department, one in 2013 for physical abuse and one in 2015 for neglectful supervision, were found to be believed. In this case, the trial court placed the three children under the Department's temporary managing conservatorship following a report in 2021 that Mother was using marijuana while driving with the children and was admitted to a psychiatric hospital. Coto testified that Mother stayed in the hospital for a month, but Mother stated she was only there for "a week or so." Mother also acknowledged that she was diagnosed with bipolar disorder five years earlier but had not been taking medication regularly since moving to Louisiana in 2016.

Mother's family service plan noted that the Valerie and Sarah reported having been evicted from homes and having utilities shut off. The plan also reported that they stated that Mother was physically, mentally, and emotionally abusive to them. As discussed above, Valerie and Sarah received mental health assessments in December 2021 and were diagnosed with adjustment disorder, mixed anxiety, depressed mood, and unspecified trauma. The assessment also noted child neglect and suspected physical abuse. Valerie and Sarah also reported experiencing suicidal thoughts and engaging in self-harm. Mother's, Valerie's, and Sarah's difficulties

20

favor Alan's termination because it shows Mother's parental abilities and the instability of her home. *See Holley*, 544 S.W.2d at 371–72; *See In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (factfinder may infer parent's future conduct from past conduct and should consider history of child neglect in best-interest analysis); *In re N.S.M.*, No. 01-20-00764-CV, 2021 WL 1217328, at *4 (Tex. App.—Houston [1st Dist.] Apr. 1, 2021, pet. denied) (mem. op.) (parent's mental health may be considered when determining best interest).

Coto noted that because Mother lived in Louisiana, she did not take drug tests on a random basis as required by her family plan, but that she was tested eight times. Mother only tested positive once, for cocaine, in November 2022 before she completed her drug counseling services. But Mother admitted drug use, including ecstasy and marijuana, on other occasions after her children were removed from her care. Mother's drug use while this case was pending supports the trial court's best-interest determination. *See In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *15 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.); *see also In re Y.G.*, No. 01-22-00181-CV, 2022 WL 3362953, at *13 (Tex. App.— Houston [1st Dist.] Aug. 16, 2022, pet. denied) (mem. op.) (weighing drug use when determining second, third, fourth, and seventh *Holley* factors); TEX. FAM. CODE § 263.307(b)(8) (in determining best interest, courts may consider history of substance abuse by child's family).

Lastly, the evidence supporting the trial court's constructive-abandonment finding was also relevant to the best-interest analysis. *See In re A.C.*, 560 S.W.3d at 631–32 (same evidence that is proof for termination under section 161.001(b)(1) may be probative of best-interest determination for the child). As discussed above, Mother did not visit Alan at all for the first seven months, despite traveling to Houston to visit two of her other children monthly, and had other months without visitation. She also made no efforts to have phone or video calls with Alan when she did not visit. Mother's failure to regularly visit or maintain contact with Alan favors termination as well. *See In re N.S.M.*, 2021 WL 1217328, at *4 (factfinder could have reasonably found that no parent-child bond existed, given that 14-month-old child was removed from mother's care after birth and mother visited only three or four times in nine months); *In re J.A.*, No. 01-21-00606-CV, 2022 WL 802982, at *8 (Tex. App.—Houston [1st Dist.] Mar. 17, 2022, no pet.) (mem. op.) ("A parent's failure to regularly visit her child after removal may support a finding that termination of the parent's rights is in the child's best interest.").

Rather than disputing the best interest outcome under *Holley*, Mother's only argument is that the trial court should have established an arrangement short of terminating her parental rights. She points to Foster Mother's testimony that she would want Alan to have a relationship with Mother as evidence that the trial court

should not have terminated her parental rights. But Mother has provided no authority for her assertion that the trial court had to fashion an alternative to termination.

Although we agree that the right to parent is one of constitutional dimension, the Department need not show that other alternatives, short of termination, are available. *See In re N.A.*, Nos. 02-13-00345-CV, 02-13-00346-CV, 2014 WL 814195, at *7 (Tex. App.—Fort Worth Feb. 28, 2014, no pet.) (mem. op.); *In re V.L.A.*, No. 02-13-00147-CV, 2013 WL 5434008, at *7 (Tex. App.—Fort Worth Sept. 26, 2013, no pet.) (mem. op.). Foster Mother's testimony was evidence the trial court could consider in deciding whether termination was in Alan's best interest. And the trial court would have considered this along with evidence that Mother was engaging in services outlined in her family services plan. Mother had provided evidence of her lease and employment; her participation in family therapy; completion of a substance abuse evaluation in December 2021; completion of a psychiatric evaluation in December 2022; completion of a psychological evaluation in February 2022; completion of substance abuse counseling in December 2022; completion of individual counseling in June 2022; and that she began taking medication for her bipolar disorder after her hospitalization in 2021. To the extent that any of that evidence contradicted the trial court's finding, we assume the factfinder resolved the dispute in favor of its finding. *See In re A.C.*, 560 S.W.3d at 630–31 (discussing legal sufficiency). Even when considering the disputed evidence

23

against the evidence favorable to the finding, we must still give deference to the factfinder, who observed witness testimony firsthand, and is the sole arbiter of assessing the credibility and demeanor of witnesses. *See id.* at 631 (discussing factual sufficiency); *In re. A.B.*, 437 S.W.3d at 503 (same).

Considering the record, a factfinder could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in Alan's best interest. *See* TEX. FAM. CODE §§ 161.001(b)(2), 263.307(b); *Holley*, 544 S.W.2d at 371–72. We hold that the evidence was legally and factually sufficient to support the trial court's best-interest finding. We overrule Mother's second issue.

### Conservatorship

In her final issue, Mother challenges the appointment of the Department as sole managing conservator.

When the parental rights of all living parents of a child are terminated, the trial court must appoint a "competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." TEX. FAM. CODE § 161.207(a); *see In re J.D.G.*, 570 S.W.3d 839, 856 (Tex. App.—Houston [1st Dist.] 2018, pet. den.). We review conservatorship determinations for an abuse of discretion and reverse only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

An order terminating the parent-child relationship divests a parent of legal rights and duties toward the child. *See* TEX. FAM. CODE § 161.206(b). Once we overrule a parent's challenge to an order terminating parental rights, the trial court's appointment of the Department as sole managing conservator may be considered a "consequence of the termination." *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.). Because Mother's challenge to the trial court's order terminating her parental rights has been overruled, the order has divested Mother of her legal rights and duties related to Alan. *See* TEX. FAM. CODE § 161.206(b). So Mother lacks standing to challenge the appointment of the Department as Alan's sole managing conservator. *See In re J.D.G.*, 570 S.W.3d at 855–56; *see also E.A. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016, pet. denied) (mem. op.) (holding that because Mother had been divested of her legal rights to child, she could not challenge conservatorship determination). We overrule Mother's final issue.

### Conclusion

We affirm the judgment of the trial court.

Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Farris.

25